**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN E. TAYLOR (R-66376) | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 17 C 1552 |
| | ) | |
| WALTER NICHOLSON, Warden,[1] | ) | Judge Rebecca R. Pallmeyer |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Three weeks after marrying John E. Taylor, Nickole Kitchen died at his hands. Taylor left her body in a locked bedroom and fled to Virginia, but was apprehended there, and later convicted and sentenced to sixty years in prison. Taylor now seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, asserting two claims: (1) that the trial court erred by refusing to issue a ruling on his motion *in limine* to bar admission of his prior convictions, should he choose to testify; and (2) that his Confrontation Clause rights were violated when a medical expert who did not prepare the autopsy report was permitted to testify about the conclusions in that report. For reasons explained below, the court concludes neither of his claims supports habeas relief.

## FACTS

In an unpublished order affirming Taylor's conviction, the Illinois Appellate Court summarized the trial testimony. Taylor does not challenge the state court's findings, and this court presumes they are correct, absent clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007).

---

[1] During the pendency of this case, Walter Nicholson replaced Randy Pfister as Petitioner's custodian at the Stateville Correctional Center. Nicholson has been substituted as the proper Respondent. *See* FED. R. CIV. P. 25(d).

**The Prosecution's Case**

Nickole Kitchen and John Taylor were married on September 27, 2003. (Unpublished Order, *People v. Taylor*, No. 03 CR 26182, 9/18/2010 [15-9] (hereinafter, "Unpublished Order"), at 3.) The couple traveled to Florida for their honeymoon, but Nickole returned to her mother's home by herself after just four days—"hysterical," her mother recalled. *Id.* On October 14, 2003, the night she died, Nickole was at her mother's home. Her mother had gone to the store with another family member, but Nickole's uncle, Little Kitchen, was there watching television with his own uncle when Taylor rang the doorbell. (*Id.* at 3-4.) Nickole met him at the door and the couple went into the bedroom. (*Id.* at 4.)

At some point, Little Kitchen's daughter Vicky Richard arrived with her own daughters. Vicky Richard was visiting with her grandmother, who was also at home, in the bedroom adjacent to Nickole's. (*Id.*) Vicky Richard "heard something seem like it had fell on the floor and . . . a noise [sounded like] 'huh'" from the next bedroom. Vicky did not hear any screaming, and believed Nickole and Taylor were engaged in sex. (*Id.* at 4, 5.) At some point thereafter, Taylor left the apartment by himself. (*Id.*) As he was leaving, Taylor spoke to Vicky Richard's daughter, LaSharon Richard, briefly about LaSharon's college applications. (*Id.*) LaSharon observed that Taylor's shirt was open, his shirt tail was out, and his shoes were untied, but she did not observe any visible injuries, and he appeared to be calm. (*Id.*)

Vicky Richard had seen Taylor leave Nickole's bedroom, and Little Kitchen saw him leave the apartment, as well. (*Id.* at 4, 5.) Concerned about Nickole, Vicky knocked on the bedroom door and, when she got no response, picked the lock with a paper clip. (*Id.* at 4.) Inside, Little Kitchen and Vicky Richard found Nickole's unresponsive body on the bed. (*Id.* at 5.) Vicky observed marks on Nickole's lip and neck, and LaSharon observed that Nickole's body appeared purple. (*Id.*) Attempts to revive Nickole were unsuccessful. (*Id.*)

The medical examiner, Dr. Ponni Arunkumar, reviewed an autopsy report prepared by a forensic pathologist who moved to New York prior to trial. (*Id.* at 9.) Dr. Arunkumar described

injuries, including abrasions and bruising on Nickole's face, neck, arm, and thigh; hemorrhaging in her eyes, and internal injuries to her neck, scalp, and tongue. (*Id.* at 10.) Dr. Arunkumar concluded that strangulation was the cause of Nickole's death; she noted that death from strangulation can occur in three-and-a-half to six minutes. (*Id.* at 9.)

The jury heard testimony from other women with whom Taylor had relationships before his marriage to Nickole. Taylor had proposed to Tasha Jones, and she had a child by him. (*Id.* at 6.) Taylor called Jones on October 10, 2003, crying, and told Jones "he was getting a divorce and believed his wife was going to send him back to jail." (*Id.*) Then, on October 14, Taylor returned to Jones's home, told her his marriage was being annulled, that his wife Nickole "was violent," and that he wanted to reconcile with Jones. (*Id.*) Before leaving Jones's home, Taylor received a call from Nickole and "was in a happy mood" when he left. (*Id.* at 7.) Later that day, however, Taylor called Jones and stated, "'It's over, it's over, Nickole's gone. I'm sorry, I love you. Take care of my son.'" (*Id.* at 6.) When he spoke to her next, on October 16 or 17, Jones confirmed that Nickole had died (the record does not disclose how or when she learned this), and Taylor responded by saying that "there was nothing left for him to do but kill himself." (*Id.* at 7.)

On October 20, 2003, Taylor called Tracey Garfield, whom he had also dated prior to his marriage to Nickole. (*Id.* at 6.) Taylor left a voicemail message saying that his "marriage was a mistake and he should have married her [Garfield] instead of Nickole, and that he had killed her and was going to kill himself." (*Id.*)

Taylor did not carry out these suicide threats. Instead, he fled the jurisdiction. FBI Agent Matthew Alcoke testified that he tracked Taylor's automobile to New York City. (*Id.* at 7.) From there, Alcoke learned, Taylor rented another car and drove to Virginia. (*Id.* at 8.) Two other FBI agents attempted to take Taylor into custody from the Virginia hotel room where he was staying, but their efforts were unsuccessful, and Taylor was seized by local SWAT team officers. (*Id.*) On his return from Virginia, Taylor told a law enforcement officer that he knew he had killed Nicole and that he "'ha[d] to live with it.'" (*Id.* at 15.)

3

**Defense Case**

When the prosecution rested, Taylor called two character witnesses: a member of his church, and the church pastor, both of whom characterized him as a peaceful person. (*Id.* at 10.) Taylor also testified in his own defense. He acknowledged having committed robberies in the 1980's as a result of drug addiction, and serving time in prison. (*Id.*) After his release, Taylor became a minister, and met Nickole while preaching at the Joshua Missionary Baptist Church. (*Id.* at 11.)

After the wedding in September 2003, Taylor said, he and Nickole traveled to Florida for a honeymoon; he explained that Nickole left early and flew home to be with her ailing grandmother, while Taylor himself remained behind for a preaching assignment in Orlando. (*Id.*) On cross-examination, Taylor acknowledged he had been arrested for domestic battery while in Florida, but he denied that was the day that Nicole left for home. (*Id.* at 14.) He recalled that Nickole met him at the airport on his return, that they spent that night and the next night together, and that he saw her every day at her mother's home. (*Id.* at 11.)

Taylor confirmed that he was at the home of Tasha Jones on October 14, 2003, visiting his son. (*Id.*) He testified that Nickole called him, and he left Jones's home, feeling happy about seeing his wife. (*Id.*) On his arrival at her mother's home, Nickole let Taylor into the apartment and directed him to the bedroom, where he closed and locked the door. (*Id.* at 11-12.) The two had a discussion about Taylor's need for their marriage license in order to buy auto insurance. (*Id.* at 12.) Taylor testified that Nickole was angry and announced that she wanted a legal separation; according to Taylor, Nickole told him that she wanted to "'fuck whoever I want to fuck,'" that she was "'tired of this shit,'" and that she would not be "'breaking down these church doors with you preaching any more.'" (*Id.*). Finally, Taylor reported, Nickole said, "I want to go when I want to go, do what I want to do. I am fucking Allen too." (Id.)

Taylor responded, he testified, by saying that he could not "believe this is where you want our relationship to go to," and by attempting to embrace her. (*Id.*) But Nickole responded angrily,

4

"swinging and hitting," so Taylor "'put the pillow in between the two of [them].'" (*Id.* at 13.)  A struggle ensued, which Taylor acknowledged was similar to the sort of fighting that had occurred between them "'two or three'" times before. (*Id.*)  Taylor and Nickole scratched each other's faces, and Taylor claimed that he held Nickole on the floor while he sat on the edge of the bed, and that Nickole took hold of his tie and pulled it. (*Id.*)  The tie became wrapped around her neck, he said, and as they both pulled at it, in the Illinois Appellate court's words, "she then gasped, he let go, and she fell over." (*Id.*)

Taylor testified that his attempts to wake her were unsuccessful, so he placed her on the bed, pulled the cover over her, and then, in a panic, left the apartment without speaking to anyone. (*Id.*)  Though he knew she was unconscious, he did not ask family members for help, did not call 911, and did not call Nickole's home after leaving. (*Id.* at 14, 15.)  Instead, he drove himself home and telephoned his father and sister to ask them to "'check on Nickole, and to tell them that I was going to take my life because I believe that I might have taken her life.'" (*Id.* at 13-14.)  A few days later, he called Nickole's mother and asked her, "'[D]id I kill Nickole?'"  When Florence Kitchen confirmed that he had, Taylor responded by saying, "'Thank you, I'm gonna kill myself.'" (*Id.* at 3, 14.)  Taylor confirmed that he drove to New York by way of Detroit, Cleveland, and Philadelphia, and wound up in Charlottesville, Virginia. (*Id.* at 14.)  Despondent, Taylor consumed drugs and alcohol and refused to answer calls from the FBI because he "'wanted to make sure I was dead by the time they arrived.'" (*Id.*)  He asserted that he did not go to Nickole's home on October 14 with the intention of hurting her. (*Id.*)

The trial judge permitted the prosecutor to introduce evidence of three of Taylor's five previous felony convictions in rebuttal, as relevant to his credibility. (*Id.* at 16-17.)  The jurors found him guilty of first degree murder, and Taylor was sentenced to 60 years in custody. (*Id.* at 17.)

5

**Appeal and Post-Conviction Proceedings**

On direct appeal, Taylor asserted several claims, including the two at issue in his petition to this court. Specifically, he argued that the trial court abused its discretion by refusing to rule, pretrial, on his motion to bar evidence of his previous convictions; and that his Sixth Amendment right to confront witnesses was violated when the court permitted Dr. Arunkumar to testify concerning an autopsy report that she herself did not prepare. The Appellate Court confirmed his conviction, however, and the Illinois Supreme Court denied his petition for leave to appeal. Taylor also filed a state post-conviction petition pursuant to 725 ILCS 5/122-1 et seq., raising claims that are not before this court. It is undisputed that Taylor has exhausted state court review and presented his claims through one full round of review in state court. The court addresses these two claims below.

## DISCUSSION

As noted, the claims Taylor asserts in this petition were presented to the Illinois Appellate Court on direct appeal, and that court analyzed them in detail. This court's review of those issues is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotation marks and citation omitted). Thus, Taylor is entitled to relief only if the state court's adjudication of his claims resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the state court decision was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**I.     Trial Court's Failure to Rule on Petitioner's Motion *in Limine***

Taylor's more significant claim is the first: Prior to trial, he moved *in limine* to exclude evidence of his prior convictions on the ground that they were more prejudicial than probative. Tracking in detail the language of FED. R. EVID. 609 and the Advisory Committee comments, the

Illinois Supreme Court laid out standards for evaluating the admissibility of previous convictions in *People v. Montgomery*, 47 Ill. 2d 510, 516-17, 268 N.E.2d 695, 698-99 (1971). The *Montgomery* court, like Rule 609 and the Advisory Committee, recognized that a number of factors are relevant to admissibility, including the "nature of the prior crimes, . . . the age and circumstances of the defendant, and . . . the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction."

The trial judge in Taylor's case declined to rule on the motion *in limine*. He stated, "'I will tell you what I tell everyone . . . one of the flaws of *Montgomery* is that I have to make a decision and weigh whether it's more probative than prejudicial and . . . I can't do that until the defendant testifies.'" (Unpublished Order, [15-9], at 2.) Defense counsel noted that the five prior convictions were robbery convictions, unrelated to the crime for which Taylor was on trial. (*Id.* at 2-3.) The judge responded by telling her he would hold off on ruling until after her client's direct examination. (*Id.*)

This practice, the Illinois Appellate Court held, was error. (*Id.* at 18-23.) The court cited *People v. Patrick*, 233 Ill. 2d 62, 908 N.E.2d 1 (2009)—a case decided two years after Taylor's trial. In *Patrick*, the Illinois Supreme Court described an accused person's need for a ruling on admissibility of prior convictions in making "the critical decision" whether to testify: A pretrial ruling enables defense counsel to let the jury know whether the defendant will take the stand, to "portray the defendant in a light consistent with" what the jurors will hear about his record, and "front" or disclose the defendant's record in direct examination, potentially defusing its significance. (Unpublished Order [15-9], at 20, citing *Patrick*, 233 Ill. 2d at 70, 908 N.E.2d at 6.) In most instances, the *Patrick* Court explained, a trial court's refusal to rule before trial, when it has enough information to do so, is an abuse of discretion. *Patrick*, 233 Ill.2d at 73, 908 N.E.2d at 7. In any case, the Court observed, a "blanket policy" of refusing to rule on the admissibility of prior convictions until after the defendant has testified is improper.

7

That is what happened in Taylor's case: the trial court enforced a blanket policy ("I will tell you what I tell everyone") and did not rule on the motion until after Taylor had taken the stand. The Illinois Appellate Court agreed with Taylor that the trial court abused its discretion in delaying its ruling in his case. (Unpublished Order [15-9], at 23.)

The Illinois Appellate Court pointed out, however, that *Patrick* itself acknowledged such an error could be harmless. (Unpublished Order [15-9], at 23, citing *Patrick*, 233 Ill. 2d at 75, 908 N.E.2d at 8-9.) To determine whether the result would have been the same, despite the error, the court considers how the error contributed to the conviction, whether the other evidence of the defendant's guilt is overwhelming; and whether the erroneously-admitted evidence is cumulative. (Unpublished order [15-9], at 23, citing *People v. Melchor*, 376 Ill App. 3d 444, 457 875 N.E.2d 1261, 1272 (1st Dist. 2007). In reviewing Taylor's conviction, the Appellate Court noted the overwhelming evidence of his guilt: an officer's testimony that Taylor admitted killing his wife, Taylor's failure to summon medical help after his wife stopped breathing, Taylor's calm conversation with a niece after the episode, and his flight from Chicago. (Unpublished Order [15-9], at 23-24.) The fact that Taylor had had previous contact with the justice system was not a secret; his former girlfriend testified, on direct and under cross examination by defense counsel, that Taylor shared with her his worries that his wife would take action that could result in his being returned to jail. (See Trial Transcript [15-3], at 88:5-7; 94:20-24; 100:20-24.) She also testified that Taylor believed his marriage was a mistake and that he wanted to reconcile with the witness. (Unpublished Order [15-9], at 24; Trial Transcript [15-3] at 89:14-17.)

To these observations, this court adds the obvious: Nickole Kitchen and John Taylor's marriage was just days old, and already troubled, on October 14, 2003, when the two met at her mother's home. Nickole entered the bedroom alive, with Taylor and no one else. When he left the bedroom some time later, Nickole lay dying or already dead of strangulation. There is no genuine basis for suspicion that her death was an accident, but any such suspicion would be eliminated by the facts that Taylor never called for help, never summoned medical assistance,

8

never attempted to resuscitate Nickole, and left the apartment either silently (as he recalled) or after a brief but calm conversation with a niece (as she testified). In the days that followed, Taylor expressed his fears that Nickole was dead and acknowledged he was the cause of her death. Notably, if Taylor expected or hoped the court would rule in his favor on the *in limine* motion, his trial strategy did not show it: his lawyer elicited testimony about his fears that his wife's conduct would result in his being returned to prison. (Trial Transcript [15-4], at 100:20-24.) And he testified concerning his prior convictions on his own direct examination. (*Id.* at 17: 11-14 ("Q. [H]ow did your involvement in drugs affect your completion of your degree? A. I got arrested. Committed robberies, got arrested.").) This court agrees that the trial court's unfortunate failure to rule on Taylor's motion *in limine* before he testified was harmless beyond a reasonable doubt.

And even if the court did not agree, the Illinois court's decision was surely not contrary to, nor was it an unreasonable application of, clearly established Federal law. The wiser course, as the Illinois courts recognize, is for a trial judge to rule on a motion *in limine* of this nature prior to trial. But no Supreme Court decision establishes that a criminal defendant's right to testify is unconstitutionally abridged by the trial court's failure to rule on the admissibility of prior convictions. To the contrary, the Supreme Court has observed that "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3. (2000) (citing *Luce v. United States*, 469 U.S. 39, 41-42 (1984)).

The trial court's failure to rule on Taylor's motion does not support habeas relief.

## II.     Confrontation Clause Challenge to Medical Examiner's Testimony

Taylor's second claim requires less discussion. He asserts that his Confrontation Clause rights were violated by the admission of testimony of the medical examiner. Dr. Arunkumar did not perform the autopsy herself, and the doctor who did perform it was not available for cross-examination. The Illinois Appellate Court considered this argument, as well, and addressed it thoughtfully. The court began with a reference to the landmark Confrontation Clause case,

*Crawford v. Washington*, 541 U.S. 36 (2004), where the Supreme Court held that if an out-of-court statement is testimonial in nature, such a statement is not admissible in evidence. The Illinois Supreme Court has addressed the impact of *Crawford* on the question at issue in this case. In *People v. Leach*, 2012 IL 111534, 980 N.E.2d 570 (2012), the Court held that an autopsy report is admissible under the exceptions to the hearsay rule for business records and record of public agencies and statutes. The *Leach* court's analysis included detailed review of controlling Supreme Court cases, including *Williams v. Illinois*, 567 U.S. 50 (2012). There, the Court concluded that *Crawford* does not bar the testimony of an expert who expressed an opinion based on facts gleaned from a laboratory report, even if she lacked firsthand knowledge regarding the preparation of the report. *Leach* concluded that "a defendant's right to confrontation is not violated by the introduction of either autopsy reports prepared in the normal course of a medical examiner's duties or testimony regarding the contents of such autopsy reports by a medical examiner who did not prepare the reports." *People v. Luera*, 2014 IL App (1st) 112995-U, ¶ 44 (citing *Leach*, 2012 IL 111534, ¶¶ 57, 137).

For similar reasons, the Illinois Appellate Court found no Confrontation Clause violation in Taylor's case. This court agrees that the Illinois decision was not contrary to clearly established federal law. And again, as Respondent notes in its memorandum of law in opposition to this petition (Answer to Habeas Corpus Petition [14], at 8), if admission of Dr. Arunkumar's testimony was error at all, it was harmless beyond a reasonable doubt. The portions of Dr. Arunkumar's testimony that were based on an autopsy report related to the cause of Nickole Kitchen's death: strangulation. But the cause of death was not disputed. Taylor contended Nickole was strangled by his tie in a mutual struggle. That account was not plausible—but it was not inconsistent with Dr. Arunkumar's testimony.

Petitioner's Confrontation Clause argument is insufficient for habeas relief.

### III. Case Law Cited by Petitioner

Petitioner Taylor is not represented by counsel in this proceeding, although an attorney

reports he provided some assistance to Taylor in preparing his petition. (Disclosure of Attorney Assistance, Petition [1], at 2.) After Respondent filed an answer in opposition to the petition, Taylor filed a *pro se* reply [23] and, later, a motion to supplement his reply [27]. The court granted that motion [29]. The court notes, however, that the cases Taylor cites in his motion to supplement ([27], at 3) have little to do with issues relevant in his case. In *People v. Gibson*, 2018 IL App (1st) 162177 (1st Dist. 2018), the court reversed a conviction where the trial court had declined to draw an adverse inference from a police officer's refusal to answer questions about whether he had tortured the defendant to obtain a confession. *People v. Jones*, 2016 IL App (1st) 123371 (1st Dist. 2016), was another coerced confession case; the court held there that newly-discovered evidence of actual innocence was sufficient to require the trial court to permit a successive postconviction petition. Taylor has not suggested that any of his several inculpatory statements was coerced. The Seventh Circuit reversed the denial of habeas corpus relief in *Owens v. Duncan*, 781 F.3d 360, 365 (7th Cir. 2015), because the court concluded that the trial judge had convicted Owens on the basis of nothing more than "groundless conjecture" rather than evidence of guilt beyond a reasonable doubt. The evidence against Taylor, in contrast, was very substantial.

## **CONCLUSION**

Petitioner's request for relief pursuant to 18 U.S.C. § 2254 is denied. Because reasonable jurists could not "debate whether . . . the petition should have been resolved in a different manner," *Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011), Petitioner has thus failed to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c), and the court declines to issue a certificate of appealability. Judgment will enter in favor of the Respondent.

ENTER:

Dated: August 24, 2018

_____
REBECCA R. PALLMEYER,
United States District Judge